ACCEPTED
14-15-00028-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
7/9/2015 11:51:29 PM
CHRISTOPHER PRINE
CLERK

**NO. 14-15-00028-CV**

**IN THE FOURTEENTH COURT OF APPEALS,
HOUSTON, TEXAS**

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
7/9/2015 11:51:29 PM
CHRISTOPHER A. PRINE
Clerk

**MICHAEL JUSTIN JACOBS,**

*Appellant*

**v.**

**ADANA ALT,**

*Appellee*

On Appeal from the 395th District Court
Williamson County, Texas
Trial Court Cause No. 10-0968-F395

**REPLY BRIEF OF APPELLANT MICHAEL JUSTIN JACOBS**

Paige Frankenberry
State Bar No. 24074226
FRANKENBERRY LAW FIRM
4425 S. Mopac Expy, Suite 105
Austin, Texas 78735
(512) 252-9937 Telephone
(512) 852-5937 Facsimile
paige@frankenberrylaw.com

ATTORNEY FOR APPELLANT
MICHAEL JUSTIN JACOBS

**APPELLANT REQUESTS ORAL ARGUMENT**

# TABLE OF CONTENTS

Page

REQUEST FOR ORAL ARGUMENT ................................................................ cover

TABLE OF CONTENTS ....................................................................................... ii

INDEX OF AUTHORITIES ................................................................................ iii

REPLY ISSUES PRESENTED ............................................................................ v

REPLY TO APPELLEE'S ADDITIONAL "FACTS" ........................................ 1

SUMMARY OF THE REPLY ARGUMENT .......................................................7

REPLY ARGUMENT AND AUTHORITIES ........................................................9
    ISSUE I. AND II. ............................................................................................9
    ISSUE III. .....................................................................................................13
    ISSUE IV. ....................................................................................................19

PRAYER ............................................................................................................21

CERTIFICATE OF SERVICE ...........................................................................22

CERTIFICATE OF COMPLIANCE ..................................................................22

# INDEX OF AUTHORITIES

Page

## CASES

*Carlile v. RLS Legal Solutions, Inc.*, 138 S.W.3d 403 (Tex.App.–Houston [14th Dist.] 2004, no pet.) ........................................................................................9

*Connors v. Connors*, 796 S.W.2d 233, 236-37 (Tex. App.—Fort Worth 1990, writ denied)..................................................................................................22, 23

*In re Lee*, 411 S.W.3d 445 (Tex. 2013) (orig. proceeding) ....................................15

*In re Lee*, No. 14-11-00714-CV, 2011 WL 4036610 (Tex. App.-Houston [14th Dist.] 2011, org. proceeding) (mem. op.)....................................................15, 17

*Leyba v. State*, 416 S.W.3d 563 (Tex.App.–Houston [14th Dist.] 2013, pet. ref'd) 10

*Peralta v. Heights Medical Ctr., Inc.,* 485 U.S. 80, 99 L. Ed. 2d 75, 108 S. Ct. 896 (1988) ............................................................................................................23

IN THE FOURTEENTH COURT OF APPEALS,
HOUSTON, TEXAS

MICHAEL JUSTIN JACOBS,

*Appellant*

v.

ADANA ALT,

*Appellee*

REPLY BRIEF OF APPELLANT MICHAEL JUSTIN JACOBS

**TO THE HONORABLE COURT OF APPEALS:**

Michael Justin Jacobs, the Appellant in this Court, respectfully submits his reply brief in support of his appeal from a final order on an "Original Suit Affecting the Parent-Child Relationship" signed on August 29, 2014.

# REPLY ISSUES PRESENTED

## REPLY ISSUE I and II
### (Reply to Appellee's Responsive Issues I and II)

The complaints regarding the trial court erring or abusing its discretion by excluding a) a vicariously consented to recorded telephone conversation between the mother and daughter, and b) expert testimony that the child was afraid of her convicted pedophile uncle, were not waived.

## ISSUE III.
### (Reply to Appellee's Responsive Issue III)

The trial court did err (or alternatively abused its discretion) by designating the mother as the parent with the exclusive right to designate the child's residence, by granting the mother other exclusive rights, and by allowing the mother to have unsupervised possession of the child because the evidence was legally and factually insufficient to support such findings and/or to support that the orders were in the best interest of the child.

## ISSUE IV.
### (Reply to Appellee's Responsive Issue IV)

There is no case law or legal authority that acknowledges the common knowledge that for something to be modified, it must first exist.

# REPLY TO APPELLEE'S ADDITIONAL "FACTS"

Appellee's statements that the child "has always lived with her Mother (sic)…except for some extended visitation in the summers" and that "lack of consistent visitation contributed to a lack of attachment between the father and child" are the same disingenuous pieces of information Appellee gave to the child's therapist at the child's intake so that the child's therapist would opine that the child was not bonded to Justin (Appellee's Br. 6; 4RR 53:22-54:4, 56:3-14; 6RR 86:17-23). Later Appellee admitted to the CPS investigator, Ms. Roberts, that Appellee and Appellant cohabitated the first year of the child's life. (4RR 32:10-12). Ergo, the child lived with her father every bit as much as the child lived with her mother during the child's first year of life.

After the child's therapist learned she had been given misinformation about the extent to which Justin has been involved in his daughter's life and observed Justin and the child together, the same child therapist *changed* her opinion and testimony answering affirmatively that the child is bonded to Justin. (6RR 86:17-23). Therefore, to cite the child therapist's misinformed original opinion as if her opinion were the same by the conclusion of the trial lacks candor to the Court. Likewise, the trial court found no issues regarding the bond between Justin and the child despite Appellee continuously disputing the regularity with which Justin

exercised his visitation, although Appellee did not dispute that Justin speaks with his daughter on the telephone almost every day. (4RR 19:6-20:1; 5RR 37:1-7, 77:5-10; 6RR 66:3-7).

It is true that both Justin received a DWI and his wife a DUI or DWI while attending college, although Justin's wife's charge was expunged. (3RR 159:12-13, 86:5-11; 6RR 67:15-17). It is true that, as a minor, Justin drank alcohol, but was not intoxicated, hence he did not receive a DWI, and that he received a criminal trespass charge in the mail. (6RR 69:11-13). That is, he was not arrested for either event, or ever as a minor, nor was such alleged by Appellee.

It is also true that Justin has never considered himself to have a drinking problem. It is *not* true that Justin "has been to rehab for alcohol abuse" as the term "alcohol abuse" is commonly used and as Appellee presumptively uses the term. As Justin testified, he went to a rehabilitation facility more because he felt depressed after Adana left with his daughter than he did for drinking, but that he did feel like he was drinking more, or more often, than was healthy as a result of the depression. (3RR 119:5-11). *Justin is per se against drinking alcohol*, so any amount of alcohol intake besides the very occasional beer or mixed drink to Justin is *wayward*. (Suppl CR 14). Indeed, Justin had *not* received a DWI at the time he decided to go to a rehabilitation facility, so there was no legal basis for Justin to go to a rehabilitation facility. Nor did Justin have an employer or significant other

2

compelling him. He was staying at his grandmother's home recuperating from a severe work related injury. There was no one to "impress" by going to a rehabilitation facility, save Justin himself. Few, if any, "alcohol abusers," as that term is commonly used, take such a course of action wholly uncompelled and with no one to impress but themselves.

Despite a DWI four months later, Justin felt that he did gain a new lease on life from his visit to the rehabilitation facility, drinking very rarely thereafter and returning to college to acquire EMT training and an EMT license, which he accomplished. (3RR 119:18-22; 160:15-23). Justin stopped drinking alcohol all together unaided and of his own volition more than two years ago, which is also something that a person with "drinking problem" is hard pressed to accomplish on their own. (3RR 160:15-23; 6RR 38:10-11). After experiencing some marital difficulties during his wife's post-partum period, both Justin and his wife decided, inter alia, that drinking alcohol would not add to their primary focus on maintaining a happy, stable home life, so Justin's wife also no longer drinks alcohol. (Suppl CR 14).

It would also seem that Adana did not previously consider Justin to have a drinking problem either since at the default hearing where she had the opportunity give unfettered testimony, she made no absolutely no mention of alcohol or about the drinking problem that more than two years later she claimed she had witnessed

3

in Justin prior to the default hearing. (Suppl 2RR 4-20). Indeed, at the default hearing, Adana testified that it would be in the child's best interest for Justin to have standard visitation with his daughter after five mother-in-law supervised visitations for the child to become "reacquainted" with Justin (since, again, Adana has always claimed that Justin's visitation lacked regularity after she summarily took the child and moved in with her parents more than 150 miles away from the couples' Granbury home).

Two years later, after a bill of review was granted and the trial court was reviewing and "undoing" excessive child support levied against Justin at the default hearing, Adana alleged for the first time that Justin drank alcohol excessively, and but for that, he *could have* earned the salary she previously testified he actually made, and therefore, the trial court should not reduce his child support. That is, Adana first asserted that Justin drank excessively as justification for Adana exaggerating his income at the default hearing to obtain an greater-than-guideline monthly child support award.

Appellee's counsel citing a context-lacking statement from the child in reference to a "push" and Adana's unsubstantiated, vague allegation that Justin's wife told her that "police were at [Justin's] house for domestic violence," to arrive at the assertion that "Mr. Jacobs lives in a home where domestic violence occurred," is also disingenuous. CPS investigator Ms. Roberts testified that when

she questioned the child about any discord in Justin's home, the child said that she had heard Justin and his wife raise their voices at each other. Ms. Roberts said that the child also mentioned a push, but that she went back and forth on whether or not she had seen a push, nor did Ms. Roberts testify as to whether the push that may have occurred was in conjunction with the yelling or if the child saw a playful push earlier in the day or on some other occasion.

It would certainly be curious why, if there was any substance to Adana's allegation that Justin's wife told her the police where "at" Justin's house for domestic violence, Adana would wait over a year to mention it. Adana's allegation was that the police were "at" Justin's house for domestic violence–not that they were *called to* Justin's house for domestic violence, not that Justin or his wife were *questioned or investigated* by police for domestic violence, but just that the police magically showed up "at" Justin's house where, obviously, nothing resulted–is meaningless, not evidence of domestic violence. Certainly the CPS investigator would have uncovered any "domestic violence" had any such event occurred.

While Appellee questions the stability of the Jacobs' marriage, the Jacobs do not. (Suppl CR 14; 6RR 68:12-13). In fact, the Jacobs are "committed to having a long, loving marriage come hail or high water" to give their children a stable, two-parent home. (Suppl CR 14).

Appellant is the first to admit that he has made mistakes. Very little evidence

5

was produced "against" Appellant since he candidly admitted to his indiscretions during trial, even his sealed, minor records and his wife's expunged record. However, as is evidenced by Justin's willingness to look at himself and seek outside assistance if improvement is warranted, Justin has matured into a dedicated family man whose first priority is his family's well-being. (Suppl CR 14).

## SUMMARY OF THE REPLY ARGUMENTS

### I. and II.

Appellee's proffered *Carlile v. RLS Legal Solutions, Inc.*, 138 S.W.3d 403 (Tex.App.–Houston [14th Dist.] 2004, no pet.) is inapplicable to this case since Carlile's counsel never attempted to introduce the evidence at trial that Carlile later complained on appeal was "excluded" by the trial court. Here, Appellant's counsel offered the evidence, the trial court ruled to exclude the evidence, Appellant's counsel apprised the trial court of the specific contents of the excluded evidence and argued for admission of the evidence on the bases argued on appeal.

### III.

The *In re Lee* cases are instructive as to whether reasonable and fair-minded people, including reasonable and fair-minded jurists, would find the trial court's orders in this case to be in the best interest of the child. *In re Lee*, 411 S.W.3d 445 (Tex. 2013) (orig. proceeding), *In re Lee*, No. 14-11-00714-CV, 2011 WL 4036610 (Tex. App.-Houston [14th Dist.] 2011, org. proceeding) (mem. op.) (mandamus granted). Every jurist who offered an opinion on whether or not the mediated settlement agreement in *Lee*–which did provide for minimal safeguards for the child, but not supervised visitation–was in the best interest of the child, said, at a minimum, "No."

## IV.

There is no case law or other "authority" for the common knowledge proposition that where an order does not exist as a matter of law, the non-existent cannot be modified, as a matter of law.

# REPLY ARGUMENTS AND AUTHORITIES[1]

### REPLY ISSUE I and II
### (Reply to Appellee's Responsive Issues I and II)

**The complaints regarding the trial court erring or abusing its discretion by excluding a) a vicariously consented to recorded telephone conversation between the mother and daughter, and b) expert testimony that the child was afraid of her convicted pedophile uncle, were not waived.**

Appellee cites *Carlile v. RLS Legal Solutions, Inc.*, 138 S.W.3d 403 (Tex.App.–Houston [14th Dist.] 2004, no pet.) (pincite omitted by Appellee) and Texas Rule of Appellate Procedure 33.1(a) as standing for the proposition that Appellant waived complaint of the trial court's error or abuse of discretion for denying admission of: 1) a telephone conversation wherein the mother coached the child, and 2) expert testimony that demonstrated the child was scared of her uncle who has been convicted of two pedophilia felonies. Specifically, Appellee argues that Appellant waived his complaints on appeal regarding the exclusion of this evidence because Appellant failed "to obtain a bill of exceptions" and/or failed to provide the trial court "with the precise testimony excluded."

*Carlile* is wholly inapplicable to the instant case. In *Carlile* the Appellant's counsel never attempted to introduce the evidence at trial that Carlile's counsel argued on appeal should have been admitted. *Carlile*, 138 S.W.3d at 411. Instead,

---

[1] Citations to the record are included if not previously cited.

Carlile's counsel only sought a ruling on the admissibility of two exhibits *prior* to trial, and the trial court *deferred* ruling on the admissibility of the exhibits. *Id*. Since no attempt was made by Carlile's counsel to introduce the evidence thereafter during trial, there was never a ruling for Carlile *to* appeal. *Id*. In the instant case, Appellant's counsel attempted to introduce both the recorded telephone conversation and the expert testimony.

While Appellee's counsel does not specifically set out in his brief how Texas Rule of Civil Procedure 33.1(a) vitiates Appellant's complaints on appeal regarding the excluded evidence, this rule is well-summarized in *Leyba v. State*, 416 S.W.3d 563 (Tex.App.–Houston [14th Dist.] 2013, pet. ref'd):

> To preserve error regarding the exclusion of evidence, the [complaintant] must offer the evidence at trial and obtain an adverse ruling from the trial court. *See Roberts v. State*, 220 S.W.3d 521, 532 (Tex.Crim.App.2007). After obtaining an adverse ruling, the [complaintant] must make an offer of proof conveying the substance of the proffered evidence so that the reviewing court may determine whether the exclusion was erroneous or harmful. *See* Tex.R. Evid. 103(a)(2); Tex.R.App. P. 33.1. The proof may be offered informally, **_or_** through a formal bill of exceptions. *See Love v. State*, 861 S.W.2d 899, 901 (Tex.Crim.App. 1993) ("An informal bill will suffice as an offer of proof when it includes a concise statement of counsel's belief of what the testimony would show.").

*Id*. at 574 (emphasis added).

Here, not only did Appellant's counsel seek to introduce the excluded the

evidence in question during trial on August 20, 2014, the trial court made adverse rulings during the trial (and findings of fact and conclusions of law thereafter) regarding the exclusion of the evidence, and Appellant made an informal offer of proof by apprising the trial court during trial of the precise contents of the evidence it sought to have admitted. Additionally, Appellant's bases for complaint on appeal comport with counsel's bases during trial.

Specifically, regarding the telephone conversation, the trial court was well aware that the recorded phone call that Justin's counsel sought to introduce evidenced mother coaching the child to change the child's prior unsolicited statement in a telephone call with Justin that the child flew kites with her grandfather during a time Adana was prohibited from having the child in that grandfather's presence. (6RR 44:2-13, 47:3-16). The court was aware that Justin's counsel's argument was that Justin had "vicarious consent" under *Alemeda* to record the calls. (6RR 42:10-17; 51:16-19) (see Appellant's Brief, Issue I for citation and argument). Justin testified that he was concerned that Adana was continuing to violate injunctions that were put in place to protect the child, and that he needed to substantiate these concerns, as the reasons why he felt it was necessary to begin recording calls between the child and Adana. That is, Justin testified as to the basis for vicarious consent. (6RR 39:14-23, 43:10-45:25). Nonetheless, the trail court *ruled* that recording the child's call with Appellee was

11

not in the child's best interest, and thus not admissible (unless Adana consented in court, which she did not). (6RR 52:5-19; 55:13-56:6).

Likewise, the trial court understood, but did not appreciate, Justin's counsel's argument that the child was not *treated* by Dr. White, but only informally examined. (5RR 19:11-17; 20:1-2, 11-14, 23-25). The trial court's response to this argument during trial was that the difference in language was 'game playing,' rather than a result of Justin's genuine concern that his daughter had been repeatedly touched by a twice convicted pedophile recently released from a nine-year prison term in violation of a permanent injunction, that his daughter had been coached not to tell anyone about her contact with her uncle, and that his daughter had been coerced into recanting the outcry that she was playing touch games with the uncle to the child's therapist and the interviewer at the Child Advocacy Center (whom the child told she told she did not have *any* uncles). (5RR 51:10-52:12). Since the trial court opined that Justin had no right to take his daughter to psychologist Dr. White, even for an examination, but that only the trial court or the mother who the trial court believed allowed her child to be repeatedly touched by her pedophilia brother had a right to have the child examined, the child's statement were 'ill-gotten.' (5RR 52:5-54:24). Without authorization to have the child examined in the eyes of the trial court, the trial court ruled that they were either "irrelevant" or "hearsay" rather than very relevant statements

considering the implications of those statements and statements made for the purposes of a medical diagnosis (or other hearsay exception, or even as a statement not meeting the hearsay definition). (5RR 19:18-19, 55:6-8). Thus, the trial court *ruled* that neither Justin nor the expert Dr. Kelley could testify that the child said, unprompted, to Dr. White that she was afraid of her Uncle Gilby. (5RR 55:6-8).

## ISSUE III.
### (Reply to Appellee's Responsive Issue III)

**The trial court did err (or alternatively abused its discretion) by designating the mother as the parent with the exclusive right to designate the child's residence, by granting the mother other exclusive rights, and by allowing the mother to have unsupervised possession of the child because the evidence was legally and factually insufficient to support such findings and/or to support that the orders were in the best interest of the child.**

Despite Appellee's assertions that Justin has not been a perfect person and that his marriage has not always been perfect, his parenting has never been questioned, and no one has ever alleged that he has, or would, endanger the physical, mental, or emotional well-being of his children. On the contrary, Justin has fought at every turn to protect his and Adana's daughter while Adana has publically fought for their child to have a personal relationship with a twice-convicted pedophilia sex offender.

On April 30, 2014, the trial court stated, "I think the child has been around [Uncle Gilby]. I think the child has played games with him, and I am not going to put up with that. To me, that's an absolute no-brainer, " and "I'm not going to wait

13

until this little girl is fondled to do something about it." (4RR 107:7-8, 111:7-10). On May 21, 2014, the trial court stated, "If the child comes back to mom, [the child's maternal grandmother] is going to have contact with this child for the foreseeable future." The trial courts' final ruling less than three months later returning the child to her mother without any changes to the prior order remains an absolute mystery when a perfectly good, but not perfect, parent and joint managing conservator is available and has repeatedly demonstrated his ability and willingness to care for and protect the child.

Most importantly, despite Appellee's assertions that Justin has not been a perfect person and that his marriage has not always been perfect, no reasonable and fair-minded person, or jurist, would have reached the same conclusion that it was in the best interest of the child to be returned to Adana, or for Adana to have unsupervised possession of the child. The most illustrative case on this point, perhaps, and one with which this court is entirely familiar, is *In re Lee*, No. 14-11-00714-CV, 2011 WL 4036610 (Tex. App.-Houston [14th Dist.] 2011, org. proceeding) (mem. op.) (mandamus granted), *In re Lee,* 411 S.W.3d 445 (Tex. 2013) (orig. proceeding).

Although the Texas Supreme Court decided in *Lee's* plurality opinion that the sole issue was one of statutory interpretation regarding a trial court's lack of authority to deny entry of an order reflecting a properly executed mediated

settlement agreement ("MSA") based on a best interest of the child inquiry, *Lee's* procedural history is highly instructive as to whether any reasonable and fair-minded person, or jurist, would have allowed Adana to have unsupervised contact with the child in this case. Here, the parties did not enter into an MSA and the sole issue for the trial court *was* a best interest inquiry. Here, the trial court was free to leave the child in the protective custody of the father.

Like the evidence in this case, the record in *Lee* reflects, inter alia, that:

1. The mother allowed her young daughter to repeatedly be in the presence of a convicted, registered pedophilia sex-offender in a private setting;

2. There was no evidence that the child had been molested yet (but there was also no evidence on the record available to the public in *Lee* that the child had been verbally or physically coerced to maintain silence about the child's contact with the registered sex offender).

Unlike this case, the record in *Lee* reflects, inter alia, that:

1. The parent who allowed the child to repeatedly be in the presence of a pedophilia sex-offender did not have the right to designate the primary residence of the child;

2. The parent who allowed the child to repeatedly be in the presence of the pedophilia sex-offender did not, herself, violate a court-order enjoining her from having the child in the presence of the pedophilia sex-offender;

15

3. There was no evidence that the mother in Lee would disregard the injunction in the MSA prohibiting the child from being within five miles of the sex-offender;

4. The final order would provide that the mother's sex-offender relative would never be within five miles of the child;

5. The final order would provide that Dad was to be given the exact whereabouts of, and the make and model driven by, the mother's sex-offender relative prior to the mother's visits with the child; and

6. The final order would provide that Dad had the right to physically verify the information on the sex-offender relative's location during the mother's visits with the child.

Also, in the instant case, there are no protections for the child in the trial court's final order that have not already been demonstrated to the trial court to be completely illusory–prohibitions that Adana is willing to violate. Surely publically pleading with a court to allow contact between one's young daughter and a convicted pedophilia sex-offender is not only foretelling, but the measure of an improper bond between a parent and child.

And further, here, the sex-offender uncle is almost always within five miles of the child since, when Adana moved from her parents home where her brother now lives, she chose a home only a few minutes away. And while one might be

16

tempted to distinguish *Lee* based on the fact that the sex offender in that case was the mother's husband rather than her brother, Adana's life by her own admission centers around her parents and siblings. When asked who all Adana might have supervise her daughter with her sex-offender brother during the contested injunction hearing to prohibit the child from being around her brother, Adana stated that she would feel comfortable allowing her parents and sister to supervise her daughter's contact with her brother because "they're really the *only* people in my life." (2RR 14:15-16).

Even though in *Lee* the final order would provide some, albeit very minimal, safeguards for the child, and the mother had not demonstrated (twice) that she would disregard an injunction prohibiting contact between her child and the sex offender, the two trial court jurists and seven appellate jurists who offered an opinion as to a best interest inquiry found that the proposed order in *Lee*–providing unsupervised possession of the child by the mother–was *not* in the best interest of the child. *Lee*, WL 4036610 at *2, *Lee*, 411 S.W.3d at 487 (dissenting opinion). The trial court in *Lee* refused to enter an MSA that allowed mother to have unsupervised possession of the child, stating, "Appeal me." *Lee*, 411 S.W.3d at 477 (dissenting opinion), (5 MR 7 of the record in *Lee*).

The three Texas Supreme Court Justices who joined in Justice Green's dissent labeled the *Lee* MSA as "dangerous," and would have denied Lee's petition

for mandamus. *Lee*, 411 S.W.3d at 487 (dissenting opinion). The Justices who joined Justice Lehrmann's opinion and Justice Guzman did not offer an opnion as to whether or not they found the Lee MSA to be in the best interest of the child.

This court stated its *Lee* opinion that "…there is no dispute…that the mediated settlement agreement is not in the child's best interest." *Lee*, WL 4036610 at *2. Appellant asserts that the finding "there is no dispute" is equivalent to 'no reasonable, fair-minded, and unbiased person or jurist would or could come to a different conclusion,' and that any other conclusion otherwise is clearly unjust and shocks the conscience of the court.

While it seems that the best interest of the child was the trial court's primary consideration when the evidence was reopened in this case in April 2014, it seems that the best interest inquiry was lost along the way and the measure of relief to each party took its place. At the trial court's final rendition in August, rather than reciting whether it felt the child's safety would be sufficiently ensured by its orders, the trial court inexplicably recited the prior relief provided to Justin, including granting the Bill of Review and the original injunction on the uncle, as if Justin had already received his fair share of relief and the trial court could offer no more. (6RR 110:3-17). But the relief Justin sought in reopening the evidence when he learned his daughter was being touched by a twice-convicted pedophilia sex-offender was not relief he sought for himself. It was, and is, for the physical,

18

mental, and emotional safety of his young daughter.

## ISSUE IV.
### (Reply to Appellee's Responsive Issue IV)

**There is no case law or legal authority that acknowledges the common knowledge that for something to be modified, it must first exist.**

Appellee cites *Connors v. Connors*, 796 S.W.2d 233, 236-37 (Tex. App.—Fort Worth 1990, writ denied) as authority for Appellant committing a briefing waiver on Appellant's fourth issue. However, the issue in *Connors* that was insufficiently briefed is distinguishable from the issue in this case. *Id.* In *Connors*, the issue that Appellant failed to adequately brief was whether the jury verdict was contrary to the great weight and preponderance *of the evidence*. *Id.* at 236. Case law and authority abound regarding this legal standard, and in order for the standard to be met, a review and analysis *of the evidence* is necessary. Here, no case law or "authority" exits on whether or not something that does not exist can be modified, much less an abundance thereon, and a review of the "evidence" is merely a review of the order granting the Bill of Review in this case.

Moreover, even though the court in *Connors* found Appellant's brief on a particular issue in Connors to be "woefully insufficient" and, therefore constituted waiver of the issue, the court still considered and decided the issue "in the interest of justice." *Id.* at 236-37.

While *Peralta v. Heights Medical Ctr., Inc.*, 485 U.S. 80, 99 L. Ed. 2d 75,

19

108 S. Ct. 896 (1988) held that, following the grant of a Bill of Review, "*[O]nly* 'wip[ing] the slate clean…would [restore] the petitioner to the position he would have occupied had due process of law been accorded to him in the first place.' The Due Process Clause *demands* no less…," and therefore, what followed the granting of the Bill of Review in the instant case should have been an original proceeding instead of a modification, unsurprisingly, no case law could be located that points out the obvious, logical conclusion that an order cannot be modified if an order is not in existence to begin with. *Id.* at 87. (citations omitted) (emphasis added). The absence of case law or other "authority" on the common knowledge–or basic mathematics–that one cannot modify something not in existence to begin with, does not in and of itself constitute briefing waiver. Nor is analysis on the order of differential calculus necessary to assert that one minus one does, in fact, equal zero, or that one cannot get to second base (a modification) without having touched first base (having an original order *to be* modified). If an original order no longer exists *as a matter of law* (the granting of the Bill of Review on Due Process grounds), then, necessarily, a modification of a non-existent order can neither exist *as a matter of law*.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, MICHAEL JUSTIN JACOBS respectfully requests this Court reverse and render judgment removing

Adana as the parent with the exclusive right to designate the primary residence of the child, grant Justin all other Section 153.132 rights, and provide adequate protections for the child during the child's visitation with the mother in this case. Alternatively, MICHAEL JUSTIN JACOBS respectfully requests that the case be remanded to re-try all conservatorship issues while finding that the important excluded evidence should be admitted at the new trial. Because Justin has never been afforded a hearing on the original suit, MICHAEL JUSTIN JACOBS respectfully requests that the case be remanded for an original suit affecting the parent-child relationship. MICHAEL JUSTIN JACOBS respectfully requests that this Court grant him such other and further relief as to which he may show himself to be justly entitled.

Respectfully submitted,

FRANKENBERRY LAW FIRM
4425 S. Mopac Expy, Suite 105
Austin, Texas 78735
(512) 252-9937 Telephone
(512) 852-5937 Facsimile

ATTORNEY FOR APPELLANT
MICHAEL JUSTIN JACOBS

By: _____
Paige Frankenberry
State Bar No. 24074226
paige@frankenberrylaw.com

21

ATTORNEY FOR
MICHAEL JUSTIN JACOBS

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing Reply Brief has been served upon opposing counsel, Mr. Robert Ettinger, Law Office of Robert D. Ettinger, P.O. Box 50323, Austin, Texas, 78763, via electronic mail to robert@ettlaw.com, on the 9th day of July 2015.

_____
Paige Frankenberry

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this Reply Brief contains 4,653 words excluding the caption, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, signature, proof of service, certification, certificate of compliance, and appendix.

_____
Paige Frankenberry